# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| CHRISTOPHER M. MADDOX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:15-CV-36(MTT) |
| | ) | |
| Commissioner BRIAN OWENS, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER

Defendants Don Blakely, Trevonza Bobbitt, Stephen Bostick, Dominico Demundo, Tracy McIntyre, Gregory McLaughlin, and Brian Owens have moved for summary judgment on the claims of the Plaintiff, Christopher Maddox.  Doc. 23.  For the reasons discussed below, the Defendants' motion (Doc. 23) is **GRANTED**, and Maddox's claims are **DISMISSED with prejudice**.

## I. FACTS[1]

In 2013, Defendant Owens, then the Commissioner of the Georgia Department of Corrections, approved a policy to address the "major system-wide safety and security

---

[1] The following facts are undisputed.  Where facts are disputed, on summary judgment the Court must "draw all justifiable inferences" in favor of the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).  But facts contained in a party's statement of material facts which are not controverted by the other party may be considered undisputed for purposes of a motion for summary judgment.  *See* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."); M.D. Ga. L.R. 56 ("All material facts contained in the movant's statement [of material facts] which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate.").  Maddox has failed to substantively respond to the motion for summary judgment, despite being notified twice that he was required to respond or risk the Court accepting all of the factual assertions in the Defendants' motion for summary judgment as uncontroverted and his claims being dismissed.  Docs. 24; 28 at 3.  Therefore, the Court considers the uncontroverted facts set forth in the Defendants' statement of material facts and supported by evidence to be undisputed.  On the other hand, the Court "cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion."  *United States v. 5800 SW 74th Ave.*, 363 F.3d 1099, 1101 (11th Cir. 2004) (citation omitted).  Accordingly, if evidence in the record shows that a fact is disputed, the Court draws all justifiable inferences in Maddox's favor for purposes of summary judgment.

issue related to a gang (known . . . as a 'Security Threat Group' or 'STG') known as the Goodfellas." Doc. 23-11 ¶¶ 4-5. Under the policy, the Administrative Segregation program was used to separate all confirmed members of Goodfellas from the rest of the prison population in order to protect inmates and staff, in particular the segregated inmates themselves, until the Georgia Department of Corrections could safely reintroduce the members into the general population. Docs. 23-3 ¶ 27; 23-11 ¶¶ 4-5; *see* 23-4 at 53 (Standard Operating Procedures for Administrative Segregation policy, effective in 2008, outlining that Administrative Segregation is appropriate when "the staff determines that admission to or continuation in administrative segregation is necessary for the inmate's/probationer's own protection"); *id.* at 18, 20-21 (Standard Operating Procedures policy for Tier II, the descendant of the Administrative Segregation program, effective in 2016, outlining an expanded policy to also protect "staff, offenders, and the public," including in particular inmates with "documented STG activities/involvement"). The Tier II program is the successor to the Administrative Segregation program and serves a similar purpose. Docs. 23-3 ¶ 29; 23-4 at 18, 20-21. It assigns prisoners to one of several phases, incentivizing prisoners to advance through the phases by behaving well and adhering to their individualized case plan. Doc. 23-3 ¶ 5. As prisoners advance through phases of Tier II, their privileges increase. *See, e.g.*, *id.* ¶ 12.

The Defendants have set forth uncontroverted evidence that the implementation of the Administrative Segregation and Tier II programs to segregate members of STGs—in particular Goodfellas—was not intended to be punitive but rather was implemented for the safety of all staff and inmates, including in particular the prisoners who were segregated because of their membership in STGs. *See* Doc. 23-11 ¶¶ 4-5 (affidavit of Defendant Owens, swearing that the Goodfellas presented a "major system-

wide safety and security issue," which led Owens to approve the Administrative

Segregation program); 23-3 ¶ 4 (Defendant McLaughlin: "The Tier II Program is not

punitive in nature."); 23-3 at 22 (Standard Operating Procedures policy for Tier II dated

August 1, 2013: "This program is an offender management process and is not a

punishment measure."); *id.* at 53 (Standard Operating Procedures policy for

Administrative Segregation dated June 1, 2008, providing for Administrative

Segregation when, among other circumstances, "the staff determines that admission to

or continuation in administrative segregation is necessary for the inmate's/probationer's

own protection"); *see also* Docs. 23-7 ¶ 4; 23-8 ¶ 4; 23-9 ¶ 4; 23-3 at 60; 23-4 at 18.

In September 2011, while incarcerated at Ware State Prison, Maddox was

identified as a member of the Goodfellas gang, based on questioning by Georgia

Department of Corrections STG specialists and his own admission.  Docs. 23-3 ¶ 26;

23-12 ¶ 3; 23-13 at 10:13-25.  Maddox was transferred to Macon State Prison later in

2011.  Docs. 23-4 at 51; 23-13 at 8:19-23.  On February 11, 2013, members of the

Corrections Emergency Response Team at Macon State Prison handcuffed Maddox,

escorted him away from his general population cell, and put him in the Administrative

Segregation program pursuant to the policy of segregating all confirmed members of

Goodfellas.  Doc. 1-1 ¶¶ 11-13.

The Administrative Segregation program was designed to separate out prisoners

for a number of reasons, including situations in which "the staff determines that

admission to or continuation in administrative segregation is necessary for the

inmate's/probationer's own protection."  Doc. 23-4 at 53.  In order to protect prisoners'

rights, the Georgia Department of Corrections Procedures required prison officials to

take several steps when assigning prisoners to Administrative Segregation, including (1)

an initial hearing conducted by a Classification Committee in which the prisoner is given

the reason for his placement; (2) 30-day reviews of prisoners' status in Administrative Segregation; (3) maintaining individual records for each prisoner; and (4) the minimum prison conditions required for Administrative Segregation. *See id.* at 53-61. Pursuant to the Georgia Department of Corrections policies on the Administrative Segregation program, Maddox received an initial segregation hearing on February 18, 2013. Docs. 23-3 ¶ 29; 23-4 at 62.[2] Maddox had segregation hearings on March 18, April 18, May 13, May 16, June 17, July 15, August 15, August 19, and October 10, 2013. Doc. 23-4 at 63-71. In each instance, Maddox was given notice of the reason for his placement and the chance to rebut those reasons, and in each instance Defendant McLaughlin or his designee affirmed the decision of the Classification Committee to keep Maddox in the Administrative Segregation program. *See id.*[3]

In October 2013, Macon State Prison implemented the Tier II program as a successor to the Administrative Segregation program. Doc. 23-3 ¶ 29. On October 31, Maddox was put in the Tier II program. Doc. 1-1 ¶ 23. Georgia Department of Corrections policies impose certain requirements on prison officials placing prisoners in the Tier II program, such as: (1) an initial hearing conducted by the Classification Committee, subject to the warden's approval and the prisoner's right to appeal; (2) assessments by the warden of the prisoner's well-being and mental status every seven

---

[2] As discussed in a section below, Maddox claims that he did not receive an initial hearing, but (1) it is unclear if that allegation refers to his placement in Administrative Segregation or in the Tier II program; and (2) if he does allege that he did not receive an initial hearing relating to his placement in Administrative Segregation, his bare allegations are insufficient to create an issue of material fact in light of the Defendants' documentary and testimonial evidence that he did receive such a hearing. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (holding that if a party moving for summary judgment shows that there is no issue of material fact, the non-moving party must then produce evidence showing that an issue of material fact does exist, using "specific facts showing a genuine issue for trial"); *see also* Fed. R. Civ. P. 56(e)(2)-(3).

[3] Also as discussed in a section below, Maddox further claims that he did not have the opportunity to rebut the reasons given for his placement, but those bare allegations fail against the Defendants' uncontroverted evidence and Maddox's own deposition testimony.

days; (3) 90-day reviews at which the Classification Committee evaluates the prisoner's progress and determines whether to transfer the prisoner to a different Tier II phase, retain the prisoner in the current phase, or reassign the prisoner out of the Tier II program altogether, subject to the warden's approval and the prisoner's right to appeal; (4) safety measures; (5) maintaining individual records for each prisoner; and (6) the minimum prison conditions required for the Tier II program, including individualized privileges for each phase of the program. *See* Doc. 23-3 at 22-59. Maddox appealed his placement in the Tier II program on November 1, 2013. Doc. 23-4 at 72. Defendant McLaughlin's designee concurred with the decision to keep Maddox in the Tier II program. *Id.* Maddox then had Tier II program 90-day reviews on February 3, April 23, July 23, November 4, and December 11, 2014. *Id.* at 73-74, 76, 78, 80. Throughout his Tier II reviews, Maddox progressed through the program. *See id.* By August 4, he had successfully gone through all three phases of Tier II, but the Classification Committee recommended Maddox be kept in the Tier II program because of his being confirmed as a member of Goodfellas. *Id.* at 76-77.

Maddox then wrote a letter to Defendant McLaughlin, asking why he remained in Tier II—where his privileges were more limited than they would be in general population—despite his completion of the Tier II program. Doc. 1-4 at 1. On August 7, 2014, McLaughlin answered that Maddox remained separated because of his Goodfella STG designation; McLaughlin also wrote that he would restore Maddox's privileges but that Maddox was still expected to adhere to the policies and procedures expected of him as a prisoner in the Tier II program. *Id.* at 2. On September 2, Maddox again wrote McLaughlin, admitting that he had become a Goodfella member in 2007 but stating that he left the gang in 2011. Doc. 1-5 at 1. Maddox asked to "get[] that GF label out my file." *Id.* McLaughlin wrote back that he would not change the designation and that

Maddox would remain in his Tier II status.  *Id.* at 2.  On September 18, Maddox filed a grievance against McLaughlin and Owens for his assignment to Tier II.  Doc. 1-7 at 1.  The grievance was denied because involuntary assignment to the Tier II program is not valid grounds for a grievance.  *Id.* at 3.  Maddox appealed, but his appeal was rejected on November 4 for the same reason.  *Id.* at 5.

Ultimately, another phase was added to the Tier II program, and Maddox was assigned to the higher phase following his December 11 hearing.  Doc. 23-4 at 80-81.  This phase, called "Phase 3+," was designed for prisoners like Maddox who advanced through each of the Tier II phases and therefore have earned expanded privileges, but must remain segregated from the general population for other reasons.  Doc. 23-3 ¶ 5.  On December 23, Maddox again appealed his assignment to the Tier II program, but again Defendant McLaughlin concurred with the assignment.  Doc. 23-4 at 82.  Maddox received more Tier II program 90-day reviews on March 12 and June 8, 2015.  *Id.* at 83, 85.  In each review, Maddox again had notice of the recommendation to keep him in the Tier II program, he had the opportunity to rebut the reason, and Warden McLaughlin or his designee approved of the Tier II Program Classification Committee's decision.  On June 10, 2015, Maddox appealed the June 8 decision to send him to a lower phase of the Tier II program, but Defendant McLaughlin concurred with the original decision.  *Id.* at 88.

Maddox filed this lawsuit on February 5, 2015, alleging that the Defendants violated his rights by "a[r]bitrarily placing the Plaintiff in potentially indefinite administrative segregation characterized by 'Super Max' confinement conditions that are atypical and significant in relation to the ordinary incidents of prison life—without conducting a segregation placement hearing before or anytime thereafter his placement

in administrative segregation." Doc. 1-1 ¶¶ 1, 41.[4] Maddox also alleges that Defendants Bobbitt, McLaughlin, and Owens violated his rights by "upholding the placement decision" and by "refusing to conduct actual investigations in respects of [sic] the Plaintiff's administrative appeals," which "reveal that they have conspired to act in concert with one another to either personally and intentionally deprive the Plaintiff of his constitutional rights" or to "overlook their subordinates' infringements upon the same." *Id.* ¶¶ 41-42.

United States Magistrate Judge Charles H. Weigle ordered Maddox to supplement his complaint to "state in detail the specific conditions of his confinement that he believes are unconstitutional," as well as "how [his] conditions of confinement differ from those he would experience in general population" and "the specific actions or inactions of each Defendant that violated [his] constitutional rights." Doc. 5 at 2 (emphasis omitted). Maddox timely supplemented his complaint. Doc. 6. In his supplement, Maddox alleges that he faces numerous conditions of confinement which are different from those he would experience in general population, where the conditions are less restrictive. *Id.* at 1-2. He also alleges specific actions or inactions of

---

[4] In the middle of his complaint, the Plaintiff alleges that the Defendants "denied the plaintiff due process of law and equal protection of the law in violation of the Fourtee[n]th (14) Amendment to the United States Constitution[]." Doc. 1-1 ¶ 41. This appears to be the only portion of the Plaintiff's complaint in which he alleges an equal protection claim. *See, e.g., id.* at 1 ("This is a civil rights action filed by Christopher M. Maddox, a state prisoner[,] for damages, and declaratory and injunctive relief under 42 U.S.C. § 1983, alleging confinement in segregation in violation of the due process clause of the Fourtee[n]th Amendment of the Constitution."). The Plaintiff has failed to demonstrate or even allege that "(1) he is similarly situated with other prisoners who received more favorable treatment; and (2) his discriminatory treatment was based on some constitutionally protected interest such as race." *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001) (internal quotation marks and citations omitted); *cf. Slakman v. Bucker*, 434 F. App'x 872, 876 (11th Cir. 2011) (reversing a district court's dismissal of a § 1983 equal protection claim when the complaint identified two paroled individuals whom the plaintiff alleged were treated more favorably than the plaintiff because of their race). Indeed, as discussed throughout this order, the Plaintiff claims that he was treated differently because of his alleged status as a Goodfella gang member. Membership in Goodfellas is not a "constitutionally protected interest" pursuant to the Fourteenth Amendment. Accordingly, to the extent the Plaintiff intended to allege claims under the equal protection clause of the Fourteenth Amendment, those claims are also **DISMISSED with prejudice**.

each Defendant that he argues violated his constitutional rights.  *Id.* at 2-4.  Further, the

Plaintiff's supplement clarifies that his claims relate to his placement in the Tier II

program in October 2013, "where conditions of his confinement became

unconstitutional."  *Id.* at 1.  The Magistrate Judge determined that, for purposes of

screening pursuant to 28 U.S.C. § 1915A(a), Maddox's Fourteenth Amendment due

process claims should proceed for factual development, and the Magistrate Judge

ordered service on the Defendants.  Doc. 7.[5]

The Defendants now move for summary judgment on Maddox's claims, arguing

that, as a matter of law: (1) Maddox's conditions do not rise to the "atypical and

significant hardship" relative to other prisoners necessary to implicate the due process

clause; (2) even if the due process clause had been implicated, Maddox received fair

process throughout his time in the Administrative Segregation and Tier II programs; (3)

individual Defendants were not causally connected to Maddox's alleged constitutional

violations; and (4) the Defendants are entitled to qualified immunity.  *See generally* Doc.

23-1.[6]  Maddox, who is representing himself, filed two documents in response to the

Defendants' motion: a "Plaintiff's Motion in Opposition to Summary Judgment" (Doc. 25)

and a "Plaintiff's Motion for 120 Day Continuance" (Doc. 26).  In the first motion, the

Plaintiff alleged that "he has not constitutionally had procedural access to the federal

discovery process in violations of the 5th and 14th Amendments" and requested an

order denying the motion for summary judgment or, in the alternative, granting the

Plaintiff a 120-day extension to respond to the Defendant's motion for summary

---

[5] There has been, by this Judge's standard, inordinate delay in the disposition of this case.  After Maddox, upon the Magistrate Judge's order, supplemented his complaint on September 21, 2015, the case sat inactive for some 20 months.  *See* Docs. 6; 7.

[6] The Court does not consider the Defendants' argument that they are not causally connected to Maddox's alleged violations, because, as discussed below, the Court finds that the Defendants are due summary judgment on their other arguments.

judgment.  Doc. 25 ¶¶ 2, 4-5.  In the second motion, the Plaintiff moved for a "90 to 120 day continuance in order to adequately respond to the named Defendants['] motion for summary judgment."  Doc. 26 at 2.  The Court denied Maddox's motions, finding that Maddox had not "explained how he was denied discovery, and he has not demonstrated good or providential cause for an extension of time."  Doc. 28 at 1-3.  The Court also ordered Maddox to respond substantively to the Defendants' motion for summary judgment on or before January 12, 2018, or risk the Court accepting all of the Defendants' factual allegations as uncontroverted.  *Id.* at 3.  Maddox did not respond.

## II. DISCUSSION

### A.    Summary Judgment Standard

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether a genuine dispute of material fact exists, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).  A material fact is any fact relevant or necessary to the outcome of the suit.  *Id.* at 248.  And a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party."  *Id.* (citation omitted).  Accordingly, "the mere existence of a scintilla of evidence in support of the position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party."  *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1243 (11th Cir. 2001) (citation and punctuation marks omitted).

The party moving for summary judgment bears the burden to show that there is no issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may make this showing by "citing to particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by showing that the non-movant cannot produce admissible evidence to support the issue of material fact. Fed. R. Civ. P. 56(c)(1). If the movant meets this burden, the non-moving party must produce evidence showing that an issue of material fact does exist. *Celotex Corp.*, 477 U.S. at 324. To do so, the non-moving party must "go beyond the pleadings" and identify "specific facts showing a genuine issue for trial." *Id.*; *see also* Fed. R. Civ. P. 56(e)(2)-(3). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255 (citation omitted).

**B.    Governing Section 1983 Law**

A claimant is entitled to relief under 42 U.S.C. § 1983 if he can prove that a person acting under color of state law deprived him of a federal right. *Almand v. DeKalb Cty.,* 103 F.3d 1510, 1513 (11th Cir.1997). The due process clause of the Fourteenth Amendment prohibits state actors from depriving a person's "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

The Eleventh Circuit has held that the due process clause "does not directly protect an inmate from changes in the conditions of his confinement" or create a constitutionally-protected interest "in being confined to a general population cell, rather than the more austere and restrictive administrative segregation quarters." *Chandler v. Baird*, 926 F.2d 1057, 1060 (11th Cir. 1991) (quoting *Hewitt v. Helms*, 459 U.S. 460, 466 (1983)). Accordingly, to prove a due process claim, a prisoner must demonstrate more than that he was merely confined in punitive segregation without a disciplinary hearing; the prisoner must also show that he in fact had a right to receive some

measure of due process due to the nature of his disciplinary sanction.  *See Sandin v. Conner*, 515 U.S. 472, 476 (1995).  The protections of the due process clause are only evoked in cases where the confinement either (1) affects the duration of the prisoner's sentence, or (2) imposes "an atypical and significant hardship" on the prisoner "in relation to the ordinary incidents of prison life."  *Id.* at 486.

If a prisoner establishes a right to receive due process, as discussed above, the court must then consider whether the defendants provided the prisoner sufficient due process, considering the following three factors identified by the United States Supreme Court in *Mathews v. Eldridge*: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  424 U.S. 319, 335 (1976); *see also Wilkinson v. Austin*, 545 U.S. 209, 224-25 (2005) (applying the *Mathews v. Eldridge* framework to Ohio prisoners' due process right to avoid assignment to the state "Supermax" facility).

Further, qualified immunity protects from lawsuits officials performing discretionary functions, unless an official "violates clearly established statutory or constitutional rights of which a reasonable person would have known."  *Gates v. Khokhar*, 2018 WL 1277395, at *3 (11th Cir. 2018) (quotation marks and citation omitted).  An official invoking qualified immunity bears the initial burden of showing he was acting within the scope of his discretionary authority.  *Id.* (citation omitted).  If the official makes that showing, the burden shifts to the plaintiff, who must show that both (1) the plaintiff's rights were violated, and (2) the right at issue was clearly established at the time of the alleged misconduct.  *Id.* (citation omitted).  To be "clearly established"

pursuant to qualified immunity, a right must be "well-established enough that every reasonable official would have understood that what he is doing violates that right." *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks omitted)).

## C.    Maddox's Claims

Maddox raises a plethora of allegations of hardships he faced in the Tier II program that he claims were not imposed on inmates in the prison's general population. *See* Doc. 6 at 1-2. In the subsections below, the Court considers whether (1) a dispute of material fact remains as to Maddox's having a liberty interest in avoiding assignment to the Tier II program, (2) a dispute of material fact remains as to whether he was afforded procedures due under the due process clause, and (3) the Defendants enjoy qualified immunity as a matter of law.

### 1.  Maddox's Alleged Due Process Interest

The undisputed material facts show that Maddox did not have an interest protected by the due process clause in avoiding assignment in the Tier II program. First, Maddox has not alleged that the duration of his confinement was affected by his assignment. *See generally* Docs. 1; 1-1; 6. Accordingly, as a matter of law Maddox cannot prove that his assignment meets the first *Sandin* method of establishing a constitutional right—proving that the assignment affects the duration of his sentence. 515 U.S. at 486.

Maddox could still show a dispute of material fact as to whether he was owed due process by demonstrating that he faced "an atypical and significant hardship" as a result of his assignment, "in relation to the ordinary incidents of prison life." *Id.* at 486. In *Al-Amin v. Donald*, the Eleventh Circuit affirmed the district court's entry of summary judgment on a plaintiff's due process claims when the plaintiff was held in administrative

segregation for a period of approximately three years but (1) the confinement in administrative segregation did not constitute an atypical and significant hardship, and (2) the plaintiff enjoyed "periodic reviews of his classification status" in accordance with the GDOC's Standard Operating Procedures. 165 F. App'x 733, 739 (2006). And in *Morefield v. Smith*, the Eleventh Circuit affirmed the district court's entry of summary judgment on the due process claims of a plaintiff who was held in administrative segregation for four years when "the conditions of his confinement were generally equivalent to general prison population conditions and the length of his stay in administrative segregation did not extend the length of his sentence." 404 F. App'x 443, 446 (2010). In contrast, in *Wilkinson v. Austin*, the Supreme Court held that the Ohio "Supermax" prisons created "atypical and significant hardships" relative to the general prison population in that (1) as "likely would apply to most solitary confinement facilities," almost all human contact was prohibited, light shined on the prisoners 24 hours per day, and prisoners' exercise was limited to a "small indoor room;" (2) the placement was indefinite and reviewed only annually; and (3) placement in the Supermax program disqualified otherwise eligible inmates from parole consideration. 545 U.S. at 223-24. The Supreme Court observed that "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that [the prisoners] have a liberty interest in avoiding assignment to [the program]." *Id.* at 224 (citation omitted). Therefore, the Court considers Maddox's circumstances, "taken together," to determine whether a fact issue remains as to whether his conditions "impose[d] an atypical and significant hardship within the correctional context." *Id.*

Maddox has alleged that the following circumstances constitute atypical and significant hardship: deprivation of property; commissary restrictions; restricted access

to the prison's law library, as well as books and other reading materials; confiscation and withholding of mail; visitation restrictions; lack of access to educational classes; ventilation and exposure to elements in prison cell; lack of water; inadequate sanitation and clothing; a manual lock system which is dangerous in an emergency; all-day confinement in cell and lack of out-of-cell recreation; inadequate medical and mental health services; and fabricated incident reports. Doc. 6 at 1-2. In moving for summary judgment, the Defendants have set forth evidence that no dispute exists that the Plaintiff's conditions do not constitute atypical and significant hardship, and that many of the Plaintiff's unsupported allegations are incorrect or unsupported. The Court agrees.

The Tier II program was designed to increase prisoners' privileges as they progressed through the program. *See* Doc. 23-3 at 49 (original Standard Operating Procedures for the Tier II program, specifying the increasing privileges as prisoners ascended through the Tier II stages). As to the alleged deprivation of his property, for example, Maddox was initially only allowed to possess state-issued property, but he ultimately received all of his property back through the advancement process to Phase 3+. Doc. 23-13 at 38:3-9; *see also* Doc. 23-3 ¶ 22 (stating that upon reaching Phase 3+, a prisoner is entitled to receive all personal property confiscated upon his placement in Tier II). The same is true of Maddox's restricted commissary access, which expanded from $15 for legal supplies only in Phase 1 to up to $40 of unrestricted use per week in Phase 3+; the general population has up to $60 per week. Docs. 23-3 ¶ 21; *id.* at 49; 23-13 at 38:10-39:1. While Macon State Prison's general population prisoners have direct access to the prison's law library, Maddox testified that his access to legal materials while in the Tier II program required him to fill out a form and turn it in once a week, with "two or three law cases per week" at a time; the same was true of Maddox's access to the general library, except that in Phases 1 and 2 Maddox was not allowed to

receive non-legal books and the main library form only comes to the Tier II prisoners once a week.  Docs. 23-3 ¶¶ 15-16; 23-13 at 44:8-45:1.  Prisoners in the Tier II program are, like the prisoners in general population, allowed to receive and send an unlimited amount of personal and legal mail, except that in Phases 1 and 2 of the Tier II program prisoners are not allowed to receive magazines or newspapers, and in the higher phases as well as in the general population, prisoners may only possess a combination of eight newspapers, magazines, and books at any given time.  Doc. 23-3 ¶ 15.  And Maddox testified that, other than books or magazines, which were restricted in some phases of Tier II, he received his mail without incident.  Doc. 23-13 at 50:16-51:2.

Maddox testified that his visitation was more restricted that visits to prisoners in the general population, both in frequency and in the fact that Tier II program visits were conducted through a window with a grill over it.  Doc. 23-13 at 49:16-50:15.  Prisoners in Phase 1 can only receive one visit per month, with two visitors, for up to two hours.  Doc. 23-3 ¶ 14; *id.* at 49.  This expands to two such visits per month in Phase 2 and three in Phase 3; prisoners in general population enjoy unrestricted visitation from 9:00 am to 3:00 pm on Saturday and Sunday.  *Id.*  These descending restrictions match the restrictions on phone calls: Phase 1 prisoners have one 15-minute phone call per month, Phase 2 prisoners two, and Phase 3 and 3+ prisoners three, while general population prisoners may make an unlimited number of 15-minute phone calls after 4:00 pm.  *Id.* ¶ 13; *id.* at 49.  Prisoners in the Tier II program do not have access to the vocational courses available to the prisoners in the general population, but they do have access to several educational programs, which are taught in their cells in Phases 1 and 2 and in groups in Phases 3 and 3+.  *Id.* ¶ 24.

Maddox further alleges housing differences between the general population and the Tier II program.  *See* Doc. 6 at 1-2 (alleging inadequate ventilation and shelter from

the elements, occasional lack of drinkable water, inadequate cell sanitation, a slide-lock which would be dangerous in an emergency, lack of out-of-cell recreation, and inadequate medical and mental health care).  But in his deposition, Maddox testified that the only material differences between his cells in the Tier II program and the cells for people in general population were that the general population cell had a prominent window and a door with a flap allowing prisoners to see out of the cells.  Doc. 23-13 at 40:8-15.  Defendant McLaughlin stated in his affidavit that, other than the lack of visibility to the hallways and the fact that their windows are painted gray, diffusing the cells' natural light somewhat, "the Tier II cells are essentially identical to those in general population[,] with the same standards of light, heat, ventilation, and standards of cleanliness."  Doc. 23-3 ¶ 18.  Maddox also admitted in his deposition that the food in Tier II was the same as the food in general population.  Doc. 23-13 at 39:2-7.  Maddox alleged and testified that the amount of out-of-cell recreation time for Tier II prisoners was supposed to be an hour a day, both in Tier II and in general population, but that he did not get an hour of recreation, once spending as long as two months without going outside.  Doc. 23-13 at 40:16-41:20.  But Maddox also testified that, at other times, Tier II prisoners received the same outdoors time as prisoners in the general population, which was 2-3 times per week, consistent throughout all the phases of Tier II.  Doc. 23-13 at 41:24-43:4.  For their part, the Defendants set forth evidence that Tier II prisoners are afforded outdoor recreation one hour per day five days a week, "unless there is inclement weather or a prison-wide lockdown;" general population prisoners receive three hours of outdoor exercise one day a week and two hours of outdoor recreation six days a week, in an area similar to the Tier II program members' except with the addition of a pull-up and sit-up bar, unless there is inclement weather or a lockdown.  Doc. 23-3 ¶ 23; *id.* at 49 (providing for five hours recreation time per week across all phases of the

Tier II program).  As for physical and mental health, Maddox testified that about twice a week, a counselor would come with the inspection team to Maddox's cell and assistance would be available if he requested.  Doc. 23-13 at 43:11-44:7.  Maddox ultimately never needed or requested treatment or counseling while in Tier II, but he testified that he was aware that a "sick call" form was available for him to request from the officer working the floor; the inmate would fill it out and give it to the nurse when she did her daily rounds.  *Id.* at 48:11-49:15.  Also, Defendant McLaughlin read and approved reviews of each Tier II prisoners' well-being and mental status every seven days.  Docs. 23-3 ¶ 44; *id.* at 28; 23-5 at 11-62; 23-6 at 1-55.

Finally, liberally construed, Maddox has alleged that he was not granted meaningful opportunity to rebut the reasons for his placement and continuation in the Tier II program and that the Defendants refused to actually investigate his objections and appeals.  *See* Docs. 1-1 ¶¶ 21, 41-42; 6 at 2-4.  However, unlike the prisoners in *Wilkinson*, prisoners in Macon State Prison received access to frequent documented opportunities to contest Tier II placement.  *See Wilkinson*, 545 U.S. at 224.  As Maddox testified at his deposition, he was visited every month or so during his time in the Administrative Segregation program and every 90 days or so in the Tier II program, where he was able to ask questions and speak.  Doc. 23-13 at 13:9-16:23.  Maddox was also able to appeal his Tier II placement, his progress and regress among the Tier II stages, and his continuation in the Tier II program.  Docs. 23-3 ¶¶ 32, 38, 41; 23-4 at 72, 82.

In sum, drawing all justifiable inferences in Maddox's favor, the undisputed evidence shows the following differences between placement in the Tier II program and the general population: (1) more limited access to commissary, visitation, outdoor recreation, the law library, the regular library, phone calls, and educational

opportunities, each except the outdoor recreation time lessening in severity as the prisoner progresses through the Tier II phases; (2) more limited access to personal property and leisure reading materials, each lessening and ultimately disappearing as the prisoner progresses through the phases; and (3) cells without a view of the prison hallways and with a window that is painted over rather than clear, diffusing more natural light.  To contest his placement in the program and to accelerate his advancement through the Tier II stages, Maddox had a chance to be evaluated by the Classification Committee every 90 days and to rebut and appeal those decisions.

The Court finds from the undisputed facts that these differences between the Tier II program and the general population do not rise to a level sufficient to create a liberty interest pursuant to the due process clause.  The circumstances are similar to those in *Al-Amin*, in which the Eleventh Circuit held that extended placement in administrative segregation does not implicate liberty interests under the due process clause when "this confinement has occurred under conditions substantially similar to those experienced by the general population" and the prisoner has received periodic review of his placement. 165 F. App'x at 738-39 (citation omitted).  As the United States Supreme Court noted in *Sandin*, "prisoners do not shed all constitutional rights at the prison gate, but lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."  515 U.S. at 485 (internal citations and punctuation marks omitted).  Accordingly, the Court finds there is no material issue as to whether the conditions Maddox faced in Macon State Prison, taken together, do not rise to the level of an "atypical and significant hardship within the correctional context."  *Wilkinson*, 545 U.S. at 224.

## 2. The Alleged Deprivation of Due Process

In the alternative, even if an issue of material fact remained as to whether Maddox had a protected interest in avoiding assignment to the Tier II program, the undisputed facts show that Maddox was not deprived of due process.

After finding that the plaintiffs had a liberty interest in avoiding Supermax assignment, the Supreme Court in *Wilkinson* applied the *Mathews v. Eldridge* factors and held that the prisoners had sufficient process for the following reasons: (1) prisoners' already-curtailed liberty somewhat limited the "private interest" at stake; (2) the prisoners were afforded notice of the factual basis leading to consideration for Supermax placement and a fair opportunity for rebuttal, which "are among the most important procedural mechanisms for purposes of avoiding erroneous deprivations," and prisoners were also afforded opportunities to appeal Supermax placement; and (3) the State's interest in prison security, public safety, and allocation of scarce resources limited the effectiveness and feasibility of alternative, more robust procedures. 545 U.S. at 225-28.

Here, the Defendants have documented the process afforded to Maddox. Maddox had a hearing upon his initial placement in the Administrative Segregation program, nine hearings while in the Administrative Segregation program, seven hearings while in the Tier II program, and three appeals of his placement in the Tier II program. Doc. 23-4 at 62-88. His hearings while in the Administrative Segregation program occurred on a roughly monthly basis, and his hearings while in the Tier II program were held roughly every 90 days, with the longest gap being from July 23 to November 4, 2014. *Id.* Each time, Maddox had notice of the recommendation to keep him in the Tier II program because of his validation as a member of Goodfellas, and Warden McLaughlin or his designee approved the decision. *See id.* Each time,

Maddox had the chance to state his reasons rebutting the justification for his placement, and he sometimes chose to attempt to do so. *See, e.g.*, *id.* at 62 (initial segregation hearing, stating, "I don't want no trouble, I'm trying to do my job and get home to my kids"); *id.* at 72 (first appeal, stating, "I understand that I am locked down due to my affiliation. I've been locked down 9 months now and counting with no [disciplinary reports]. It was said at first that we was locked down for our protection and safety now we're being punish. I meet no requirements for the Tier II program. So why am I locked down." (errors in original)).

Maddox alleges that "[a]t no given time was [P]laintiff given the opportunity to present his views by statement or in person to a hearing committee." Doc. 1-1 ¶ 21. He further alleges that he was put in Administrative Segregation and Tier II "without conducting a segregation placement hearing before or anytime thereafter his placement in [A]dministrative [S]egregation." *Id.* ¶ 41. He further alleges that Defendants Owens, McLaughlin, and Bobbitt "refus[ed] to conduct actual investigations in respects of the [P]laintiff's administrative appeals upon their reception and sufficient notice of these appeals reveal that they have conspired to act in concert with one another to either personally and intentionally deprive the [P]laintiff of his constitutional rights, all/or consent to—or overlook—their subordinates infringements upon the same." *Id.* ¶ 42 (errors in original).

Those cursory allegations are insufficient to create an issue of material fact in light of the Defendants' evidence—including Maddox's own deposition testimony—that Maddox did enjoy sufficient process. As noted above, Maddox was given an initial hearing upon his placement in the Administrative Segregation program. In his supplement, Maddox clarified that his constitutional violations began when he was placed in the Tier II program, not Administrative Segregation. *See* Doc. 6 at 1 ("On or

around October 31st 2013 [P]laintiff was then placed in the long-term Tier II program where conditions of his confinement became unconstitutional.").  But, to the extent Maddox contests the Defendants' failure to give him an initial hearing in the Tier II program, the Tier II program was the successor to the Administrative Segregation program, so it is not surprising that Maddox, who was already admitted to the Administrative Segregation program, was not given a new initial hearing when Macon State Prison instituted the Tier II program.  Further, Maddox himself testified at his deposition that he was visited every month or so during his time in the Administrative Segregation program and received 90 day reviews of his placement in the Tier II program, where he was able to ask questions and speak; but Maddox also testified that these were not really "hearings" because the Classification Committee members made clear to him that he would need to stay in the Tier II program until the Commissioner changed the policy regarding Goodfellas.  Doc. 23-13 at 13:9-20:22.  Maddox was able to promptly appeal his Tier II placement.  Doc. 23-4 at 72.  He had multiple opportunities to rebut the finding against him and to appeal his placement.

Further, Maddox has set forth no specific evidence that the Defendants failed to investigate his appeals or acted in concert to deny him his rights or overlook the denial of his rights.  As multiple Defendants stated in their affidavits, Maddox remained designated as a Goodfellas member, and mere renunciation of his affiliation with the Goodfellas would likely not be enough to merit removal from the Tier II program, as Maddox's admitted past involvement with the gang would present the same security issues underlying the Commissioner's decision to implement the segregation program in the first place, absent individualized evidence that Maddox's release would be an exception.  *See* Docs. 23-3 ¶ 48; 23-7 ¶ 30; 23-11 ¶ 7.  Maddox disagrees with the

outcomes of his hearings and appeals, but that does not mean that he was not afforded his constitutional due process.

Applying the *Mathews v. Eldridge* factors to this case yields similar results to the Supreme Court's holding in *Wilkinson*. As to the first factor, Maddox's already-curtailed liberty slightly limits the private interest at stake, especially considering that the Court has found that the differences between Tier II prisoners and the general population do not constitute atypical and significant hardship at all. Second, Maddox was given regular hearings, at which he had notice of the reason he was put in the Administrative Segregation and Tier II programs, a fair chance to rebut the basis of his segregation, and a process to appeal those decisions; therefore, there is a low "risk of an erroneous deprivation of such interest through the procedures used" and a low "probable value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335. And third, as in *Wilkinson*, "[p]rison security, imperiled by the brutal reality of prison gangs, provides the backdrop of the State's interest," as do the additional resources and imperilment of safety that would be required for a more robust review process. *See Wilkinson*, 545 U.S. at 225-28. Considering these findings regarding the *Mathews v. Eldridge* factors, the Court finds the undisputed evidence shows that Maddox was provided adequate process.

Accordingly, even if a fact issue remained as to whether Maddox had a liberty interest in avoiding the Tier II program, he was given adequate process in light of the factors articulated by the Supreme Court in *Mathews v. Eldridge* and applied in the prison context in *Wilkinson*. *See also. Morefield*, 404 F. App'x at 446 (holding that, even if the plaintiff in that case had been able to establish a liberty interest, "he received all the process he was due" for his four-year confinement in administrative segregation,

as he had notice of his placement, an opportunity for rebuttal, and periodic reviews of his status).

### 3. Qualified Immunity

In the second alternative, the Court finds that qualified immunity protects the Defendants from suit for monetary damages as a matter of law.[7]

Maddox's complaint and the Defendants' affidavits make clear that all of the Defendants' allegedly unconstitutional acts were done within the scope of their discretionary authority as prison officials. *See generally* Docs. 1-1 (alleging that the Defendants violated Maddox's constitutional rights by placing and keeping him in the Tier II program in their various capacities as officials with the Georgia Department of Corrections); 6 at 2-4 (same, with more particularity); *see also* Docs. 23-3 ¶¶ 3, 6-7, 11, 26, 29-44 (Defendant McLaughlin, as Warden of Macon State Prison, gave final approval personally or through a designee of prisoners' placement in and progress through the Tier II program, including Maddox's); 23-7 ¶¶ 3, 5-6, 8, 16, 18-20, 22 (Defendant Bostick, as the Tier II Administrative Segregation Program Counselor, managed the case plans of prisoners assigned to the Tier II program, including Maddox, and served on the Tier II Classification Committee, which made decisions and recommendations regarding prisoners' placement in and progress through Tier II); 23-8 ¶¶ 3, 5-6, 8, 13-16 (Defendant McIntyre, as the Tier II Administrative Segregation Unit Manager at Macon State Prison, served on the Tier II Classification Committee, which

---

[7] Maddox's complaint seeks injunctive and declaratory relief, as well as monetary damages. *See* Doc. 1-1 ¶¶ 43-52. But because Maddox has been transferred from Macon State Prison to another prison, his requests for injunctive and declaratory relief are moot. Docs. 23-3 ¶ 45; 23-4 at 51; *see Wahl v. McIver*, 773 F.2d 1169, 1173 (11th Cir. 1985) ("Absent class certification, an inmate's claim for injunctive and declaratory relief in a [§] 1983 action fails to present a case or controversy once the inmate has been transferred." (citation omitted)); *Davila v. Marshall*, 649 F. App'x 977 979-80 (11th Cir. 2016) ("[A] prisoner's request for injunctive relief relating to the conditions of his confinement becomes moot when he is transferred." (citing *Spears v. Thigpen*, 846 F.2d 1327, 1328 (11th Cir. 1988)).

made decisions and recommendations regarding prisoners' placement in and progress through the Tier II program, including Maddox's); 23-9 ¶¶ 3, 5-6, 8, 13-15 (same as Defendant McIntyre); 23-10 ¶ 3 (Defendant Blakely, as Deputy Warden of Security at Macon State Prison, acted as Defendant McLaughlin's designee in approving some of the Classification Committee's recommendations as to Maddox); 23-11 ¶¶ 3, 5 (Defendant Owens, as Commissioner of the Georgia Department of Corrections, approved the implementation of the Administrative Segregation program); 23-12 ¶¶ 3, 7 (Defendant Demundo, as Macon State Prison's Security Threat Coordinator, administered the process by which inmates seek to have STG validations officially removed from their records). The Court therefore finds that, as a matter of law, the Defendants have met their initial qualified immunity burden of showing that they acted within the scope of their discretionary authority. *See Gates*, 2018 WL 1277395, at *3 (citation omitted).

Accordingly, qualified immunity protects the Defendants from suit unless a material dispute remains as to whether both (1) the Defendants violated a right of Maddox's; and (2) the right was clearly established. *See id.* Because, as discussed above, the Court finds that the Defendants did not violate Maddox's constitutional rights as a matter of law, the first element is not met as a matter of law, and qualified immunity protects the Defendants from suit. And because the Court finds that there was no constitutional violation at all, the Court must also find that, in the alternative, the Defendants did not violate Maddox's "clearly established" rights.

**III. CONCLUSION**

For the reasons discussed above, the Defendants' motion for summary judgment

(Doc. 23) is **GRANTED**.  Maddox's claims against all of the Defendants are accordingly

**DISMISSED with prejudice**.

**SO ORDERED**, this 27th day of March, 2018.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT